# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CA-00880-SCT

*PRIDE OIL COMPANY, INC.,*

*A DELAWARE CORPORATION*

*v.*

*TOMMY BROOKS OIL COMPANY,*

*A MISSISSIPPI CORPORATION,*

*TOMMY BROOKS, INDIVIDUALLY*

*AND OMNI BANK OF MANTEE*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/05/1999 |
| TRIAL JUDGE: | HON. JOHN M. MONTGOMERY |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | KATHERINE S. KERBY |
| ATTORNEYS FOR APPELLEES: | JOHN S. HILL |
| | WILLIAM DEAN STARK |
| | DONALD ANDREW PHILLIPS |
| NATURE OF THE CASE: | CIVIL - PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 06/08/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 6/29/2000 |

**BEFORE BANKS, P.J., WALLER AND DIAZ, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

## INTRODUCTION

¶1. This appeal comes to this Court from a judgment in the Circuit Court of Oktibbeha County, Mississippi, whereby Appellees Tommy Brooks Oil Company and Tommy Brooks (collectively Brooks) were found liable for conversion of Appellant Pride Oil Company's (Pride) underground gasoline storage tanks and canopies. After the parties agreed upon a bench trial on damages, the trial judge found in favor of Pride in the amount of $16,000. After thorough consideration we find no reversible error and affirm, on partly

different grounds, the judgment of the Circuit Court of Oktibbeha County.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2. On or about January 7, 1986, James Awtrey and Sarah Awtrey executed a promissory note for the benefit of OmniBank of Mantee. As security for the indebtedness, the Awtreys gave OmniBank a first deed of trust on their "Cap'n Quick" convenience store located in Oktibbeha County, Mississippi. On or about November 14, 1985, the Awtreys entered into a contract with Pride under which the Awtreys agreed to sell gasoline furnished by Pride. In consideration of this agreement, Pride contracted with the Awtreys to install and maintain certain equipment at the Cap'n Quick, including three gasoline storage tanks and two canopies, along with all electrical and plumbing needed to install the equipment. Pride agreed to pay the Awtreys 50% of the total net profit derived from monthly gasoline sales. It was also agreed between the parties that "all property and equipment installed by [Pride should] remain the exclusive property of [Pride] and no title in and to said property or equipment [should] pass to [the Awtreys] or to any other person, firm or corporation."

¶3. In 1988, the Awtreys filed a petition for bankruptcy, and in 1989, OmniBank foreclosed its interest against the real property and began to market it. In January 1990, OmniBank sold the real property to Mike and Janet Cooper, who also operated a convenience store at that location. The Coopers, however, did not enter into any contractual arrangement with Pride to sell gasoline, and Pride did not participate in the operation of that store. After operating the store for approximately one year, the Coopers deeded back to OmniBank their interest in the real property.

¶4. The premises laid vacant until Brooks purchased the real property from OmniBank on June 23, 1992. The contract for sale of the real property specifically stated that the underground gasoline storage tanks were a part of the realty, and the transfer to Brooks did not exclude the gasoline equipment from the bill of sale or special warranty deed; nor was the conveyance made subject to a claim of Pride to ownership of the equipment. Brooks leased the property to a third party from whom Brooks derived profits from gasoline sales.

¶5. In November, 1992, Eddie Byars, the President of Pride, contacted Brooks by letter, informing him that Pride was the true owner of the equipment and offering to negotiate a sale or lease of the equipment. Brooks declined to enter into any business relations with Pride and allegedly urged Pride to take back possession of its equipment. Without ever attempting to take possession of the equipment, Pride filed this suit for conversion.

¶6. Pride's amended complaint alleged that Brooks had converted Pride's three underground gasoline storage tanks with attendant plumbing and electrical equipment and two overhead canopies. Brooks filed a third-party complaint against OmniBank claiming breach of contract and/or negligent misrepresentation and seeking indemnity for any judgment rendered against Brooks on Pride's claim for conversion. Following joinder of issues, each party filed a motion for summary judgment: Brooks and OmniBank sought to have Pride's measure of damages, if any, limited to the fair market value of the equipment at the time of conversion; and Pride sought to recover for actual and consequential damages, including lost profits, indemnification for costs associated with any environmental clean-up due to Brooks's use of the tanks, and attorney's fees and costs.

¶7. The trial judge considered all matters presented and filed an "Order with Partial Findings of Fact and

Conclusions of Law" adjudicating that:

(a) Pride's claim for conversion was well taken and to that extent its summary judgment was sustained;

(b) OmniBank breached its contract of sale with Brooks and Brooks was accordingly entitled to indemnification from OmniBank for its conversion of the subject equipment;

(c) The law in the State of Mississippi regarding the measure of damages for conversion, absent evidence of willful, malicious or fraudulent conduct, is the fair market value of the property at the time of conversion plus interest to trial;

(d) The law in the State of Mississippi further allows, in special circumstances, for the party whose property has been converted to recover both actual and consequential damages, including lost profits, if proven;

(e) There was no evidence of willful, malicious or fraudulent conduct, and for several years preceding the conversion and during the entire time in which Brooks was using the subject equipment Pride had no contractual right, opportunity or expectation to utilize the subject equipment for profit;

(f) There accordingly existed no special circumstances entitling Pride to actual or consequential damages above the fair market value of the subject property; and

(g) Absent statutory authority or as provided by contract, attorneys' fees are not recoverable under Mississippi law without proof of conduct warranting punitive damages, and there being no statutory provision for attorneys' fees arising from a conversion, there being no contract that would provide attorney's fees and there being no evidence of conduct warranting punitive damages, the court determined that Pride was not entitled to attorneys' fees or other litigation costs.

¶8. After rendering his partial findings of fact and conclusions of law, the trial judge held a bench trial to determine the fair market value of the converted equipment, which he ultimately assessed to be $16,000. The trial court entered final judgment in the amount of $16,000, plus legal interest from the date of conversion for Pride against Brooks and also entered judgment for indemnity against OmniBank for this amount. Feeling aggrieved, Pride appeals to this Court, assigning three points for review.[(1)]

<b><u>DISCUSSION</u></b>

### I. WHETHER THE TRIAL COURT ERRED IN ITS SUMMARY JUDGMENT RULING THAT THE DAMAGES FOR CONVERSION WOULD BE LIMITED TO THE FAIR MARKET VALUE OF THE PROPERTY CONVERTED, WITH INTEREST FROM THE DATE OF CONVERSION?

¶9. The circuit court's grant of summary judgment is reviewed by this Court de novo. *Hernandez v. Vickery Chevrolet-Oldsmobile Co.*, 652 So. 2d 179, 181 (Miss. 1995). The Court's review is governed by the same standard used by the circuit court under Rule 56(c) of the Mississippi Rules of Civil Procedure. *Brown v. Credit Ctr., Inc.*, 444 So. 2d 358, 362 (Miss. 1983). The trial court must review carefully all of the evidentiary matters before it: admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion is made.

*Id.* If there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, summary judgment should be granted in the moving party's favor. *Id.*

¶10. The burden of demonstrating that no genuine issue of material fact exists is on the moving party. *Id.* at 368. To defeat a motion for summary judgment, the nonmoving party must make a showing sufficient to establish the existence of the elements essential to his case. *Id.* at 362. In other words, the nonmovant must present affirmative evidence that a genuine issue of material fact exists. As to issues on which the nonmovant bears the burden of proof at trial, the movant needs only to demonstrate an absence of evidence in the record to support an essential element of the movant's claim. *Crain v. Cleveland Lodge 1532, Order of Moose, Inc.*, 641 So. 2d 1186, 1188 (Miss. 1994). The nonmovant then bears the burden by affidavit or otherwise of setting forth "specific facts showing that there are indeed genuine issues for trial." *Fruchter v. Lynch Oil Co.*, 522 So. 2d 195, 199 (Miss. 1988). The nonmovant should be given the benefit of every reasonable doubt. *Rosen v. GulfShores, Inc.*, 610 So. 2d 366, 368 (Miss. 1992).

¶11. Pride contends that the trial judge erred by limiting the damages for conversion to the fair market value of the converted property at the time of the conversion, to the exclusion of other claimed consequential damages: the value of the equipment, profits derived by Brooks from use of the equipment, indemnification for any environmental clean-up costs from Brooks's use of the equipment, and attorney's fees and other litigation costs incurred as a result of the conversion.

¶12. Citing *Sumrall Motor Co. v. Creel*, 158 Miss. 262, 130 So. 151 (1930), Brooks argues that the trial judge's ruling should be upheld since there was no evidence of willful, malicious, or fraudulent conduct on the part of Brooks and since the law is clear that the measure of damages for conversion, absent such conduct, is the fair market value of the converted property at the time of the conversion, with interest from the date of the conversion. While *Sumrall* may be read to stand for that proposition, our more recent case law suggests otherwise. In *Walker v. Brown*, 501 So. 2d 358 (Miss. 1987), this Court, in the absence of any evidence of willful wrong or fraudulent conduct on the part of the party who appealed the judgment, affirmed an award of $5,000 in actual and consequential damages for conversion of the plaintiff's refrigerated trailer, stating:

> We cannot say the jury verdict in this case is such that it must be set aside. The jury was instructed that it could award actual and consequential damages. The jury could have considered the amount of money lost on the shipment not being delivered, the Browns' expenses in staying in Mississippi for nearly five days and the consequential harm resulting from the trailer's detention. The Browns expended $420.00 on food and hotel bills and Brown had to sell his four-month old CB radio at a loss to obtain cash. The jury also could have considered lost business because of the extended stay in Jackson. Raymond Brown, Jr. testified that he intended to deliver the produce and then contract to carry another load, but could not because the trailer was gone. Brown testified that he could have delivered the produce by September 10, giving him two to three days during which he could have obtained and possibly delivered another load. We find no error in the jury award.

*Walker*, 501 So. 2d at 362. Therefore, even if conversion occurs in good faith, the complaining party may nonetheless recover damages beyond the fair market value of the converted property.

¶13. The Court's holding in *Walker* appears to be in line with the majority viewpoint. Generally, "[d]amages flowing from a conversion which are not ordinary, usual, or commonly to be expected, are recoverable if, under the circumstances, it can be fairly said that both parties have these consequences in contemplation at

the time of the wrong complained of, as the probable result thereof, and if these unusual consequences are neither uncertain, unnatural, nor remote as to cause, nor speculative and conjectural in effect." 18 Am. Jur. 2d *Conversion* § 117, at 231 (1985) (citing ***Colorado Kenworth Corp v. Whitworth***, 144 Colo. 541, 357 P.2d 626 (1960)). Also, "the general rule is that compensation for lost profits may be recovered in an action for conversion, where the loss is a proximate result of the defendant's act, and where the loss can be shown with reasonable certainty." 18 Am. Jur. 2d *Conversion* § 119, at 232 (1985) (citing ***Colorado Kenworth Corp,*** 144 Colo. 541, 357 P.2d 626 (1960)).

¶14. This Court therefore finds the trial court erred in excluding Pride's claim for lost profits and indemnification for any environmental clean-up costs associated from leakage of the converted tanks based on a lack of malicious or fraudulent conduct by Brooks. Notwithstanding, we affirm the summary judgment order limiting Pride's award of damages to the fair market value of the converted property. Brooks, in their motion for partial summary judgment, also attacked Pride's claim for damages as being highly speculative. The trial court apparently agreed and with respect to Pride's claim for lost profits, stated: "for several years preceding the conversion and during the entire time in which Brooks was using the gasoline equipment, Pride had no contractual right, opportunity or expectation of any kind to utilize the equipment for profit." A careful examination of the pleadings and depositions shows that Pride's claim for lost profits is indeed illusory. For at least one and a half years preceding Brooks's utilization of Pride's tanks, Pride did not supply gasoline products to the subject location. And the record is absent of any evidence tending to show that Pride had an opportunity or expectation to use the equipment. Furthermore, Pride did not supply any of the labor or entrepreneurial skills to the operation from which Brooks derived profits. It is therefore evident that any causal link between Pride's alleged lost profits and Brooks's act of conversion is too attenuated to create a genuine issue of material fact to submit to a jury. An award of lost profits to Pride would sanction a windfall. Likewise, there is an absence in the record of any other proof of *damages* consequential to the conversion.

¶15. As to Pride's claim for attorney's fees and litigation costs, it has long been the law in this State that absent statutory authority to the contrary, or as provided by contract, attorney fees are not recoverable absent proof of conduct which would permit an award of punitive damages. *[Aqua-Culture Technologies, Ltd. v. Holly](#)*, 677 So. 2d 171, 184-85 (Miss. 1996); ***Greenlee v. Mitchell***, 607 So. 2d 97, 108 (Miss. 1992); ***City of Laurel v. Bush***, 238 Miss. 718, 729-30, 120 So. 2d 149, 155 (1960).

¶16. The record is uncontradicted that when Brooks entered into the real estate contract with OmniBank which specifically stated that the underground tanks were a part of the realty, Brooks was not aware of Pride's claim to ownership of the equipment. There being no applicable statute which provides for attorney's fees arising from a conversion, no contract at issue which provides for attorney's fees, and no evidence of fraudulent or willfully wrong conduct on the part of Brooks, the trial court properly denied Pride's claim to attorney's fees and litigation costs.

¶17. In sum, we affirm, on partly different grounds, the trial court's summary judgment order limiting Pride's award of damages to the fair market value of the converted property at the time of conversion, with interest from the date of conversion.[(2)]

## II. WHETHER THE TRIAL COURT ERRED IN ITS FINDINGS OF FACT AS TO THE FAIR MARKET VALUE OF THE CONVERTED PROPERTY?

¶18. This Court has stated that: "[f]or review of the findings of a trial judge sitting without a jury, this Court

will reverse 'only where the findings of the trial judge are manifestly erroneous or clearly wrong.'" *Amerson v. State*, 648 So. 2d 58, 60 (Miss. 1994). The trial judge has sole authority to determine the credibility of a witness when sitting as the trier of fact in a bench trial. *Rice Researchers, Inc. v. Hiter,* 512 So. 2d 1259, 1265 (Miss. 1987). An appellate court will affirm a trial court sitting without a jury on a question of fact unless, based on substantial evidence, the trial court was manifestly wrong. *Brown v. Williams*, 504 So. 2d 1188, 1192 (Miss. 1987).

¶19. Four expert witnesses testified as to the fair market value of the converted property. Steve Holcombe testified for Pride and, using an income analysis approach, opined the fair market value of the equipment to be $75,000. Jerry Wilburn, Rick Faucette, and Jerry Bristow all testified for Brooks and OmniBank and opined the fair market value of the equipment to be $6,000, $7,500, and $16,000, respectively. The court concluded that the opinion expressed by Bristow was the most reasoned and appropriate methodology to determine the fair market value of the equipment at the time of conversion. Accordingly, the court determined the fair market of the property to be $16,000. Pride argues that the court erred in its ruling by "accepting the testimony of Jerry Bristow and rejecting the expert opinion of Steve Holcombe." The trial court's well-documented findings are as follows:

> Holcombe opined that the tanks and canopies had a contributory value of $75,000, based substantially on an income analysis from the sale of gasoline. The only cost analysis utilized by Holcombe was a determination of the cost to install entirely new tanks and canopies as of the date of the conversion, the principal utility of which, according to Holcombe, was to show the time of conversion the tanks and canopy had some residual value. Holcombe then went on to utilize what he termed to be the estimated income from gasoline sales from the date of conversion through December of 1998 (the date by which the tanks had to be upgraded to meet environmental quality standards) based on sales and per gallon profit information provided through discovery by Brooks between September of 1992, and October of 1993. Based on this information, Holcombe then determined the value of the tanks and canopies to a prospective purchaser, and concluded that based on his calculations the contributory value would be $75,000.00.

> The court is of the opinion that this analysis is unpersuasive. Holcombe admitted that he did not appraise or evaluate the tanks and canopies separate from the remainder of the property purchased by Brooks and admitted that the contributory value of $75,000.00 based on his income analysis was premised on the same entity owning, or at least leasing, the tanks and canopies as well as the remainder of the property at the convenient store site, which was not the case here. The court is further of the opinion that Holcombe's income analysis is dependent on too many subjective variables that Holcombe was unable to consider, such as the management skills of the operator of the convenience store, other entrepreneurial skills of the operator of the convenience store, the oil and gas market from and after October of 1993, the general economy of the area surrounding the convenience store, among others. Holcombe took average gasoline sales for a 14 month period after conversion and assumed they would remain constant for an additional five years despite the fact that the two previous operators of this convenience store had been unable to sustain a business and despite the fact that for more than a year prior to Brooks' purchase of the convenience store and conversion of the subject equipment no gasoline sales had taken place at this convenience store. In addition to all of this, the court simply is of the opinion that considering that the convenience store and real estate had been on the market for more than a year prior to the date of sale to Brooks in June of 1992, and the sales price to Brooks was $105,000.00, it is unreasonable to attribute a $75,000.00

price tag to the tanks and canopies.

Wilburn and Faucette are both oil and gas distributors from Tupelo, Mississippi. Both testified that because of the advanced age of the tanks, because the tanks would become obsolete unless upgraded to meet the Department of Environmental Quality standards within six years of the date of sale and because there was no real way to know the condition of the tanks at the time of sale, the tanks had essentially no value. When pressed by the court to come up with a figure for some residual value, Faucette said that while it would appear in hindsight that since the tanks had been operated for the six years following conversion they would have some residual value, it was still his opinion that in looking at those tanks in June of 1992, the risks of operating those tanks without knowing their condition or what repairs would be necessary would exceed their small residual value. Faucette and Wilburn were both of the opinion that the canopies would have some residual value, with Wilburn placing that value at $6,000.00 and Faucette placing it at $7,500.00.

Bristow testified that in his opinion the income analysis utilized was inappropriate, for many of the reasons set out above by the court. Bristow testified that he utilized the cost approach to determine the appropriate fair market value of the tanks and canopies. Bristow testified that in addition to inspecting the property on two occasions, he consulted with Brooks and reviewed the opinions of Faucette and Wilburn, as well as those of a Mr. S. V. Henry, President of Environmental Excavation and Consulting, Ltd. Bristow testified that the opinion as to the value of the canopies ranged from Wilburn's $6,000.00 to Faucette's $7,500.00, which was consistent with his experience. He testified further that in his opinion as of the date of conversion, the tanks would have had some residual value. He testified that Brooks stated to him that following necessary repairs and restorations the tanks would have a value of between $30,000.00 and $32,000.00, but that the repairs necessary for operational purposes and to bring the tanks up to environmental quality standards cost Brooks $23,500.00. Bristow was therefore of the opinion that at the time of the conversion the tanks had a fair market value between $6,500 and $8,500.00. Based on the foregoing, Bristow concluded that the range of fair market values of the tanks and canopies at the time of conversion was from a low end of $12,500.00 to a high end of $16,000.00.

Brooks and the principal owner of Pride Oil, Eddie Byars, also testified as to their opinions regarding the value of the tanks and canopies. Byars largely agreed with the testimony given by Holcombe, and Brooks largely agreed with the testimony given by Wilburn and Faucette.

¶20. In a case such as this, the search for the true fair market value of the converted property focused on a battle of the experts. A review of the record reveals that Bristow's cost approach was indeed reasoned and did not rely on subjective variables, such as the managerial skills of the operator of the store, inherent in Holcombe's income analysis approach. We cannot say that the trial court's findings were clearly erroneous.

## CONCLUSION

¶21. For the foregoing reasons, the judgment of the Oktibbeha County Circuit Court is affirmed.

¶22. **AFFIRMED.**

> **PRATHER, C.J., PITTMAN AND BANKS, P.JJ., SMITH, COBB AND DIAZ, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY. MILLS, J., NOT**

**PARTICIPATING.**

1. For purposes of clarity, Pride's points of error are combined and rephrased.

2. Pride also argues that the trial court erred in sustaining OmniBank's "Motion to Strike Pride Oil Company, Inc.'s Response Incorporating Memorandum Brief in Response to OmniBank's Motion for Partial Summary Judgment." Because this Court finds that summary judgment was appropriate on the issue of consequential damages, this argument is now immaterial.